### H. B. ZACHRY CO. v. FULLILOVE et al.

#### No. 4349.

Court of Civil Appeals of Texas. El Paso.

Nov. 18, 1943.

Rehearing Denied Dec. 16, 1943.

Grady Barrett and W. F. Nowlin, both of San Antonio (Brewer, Matthews, Nowlin & Macfarlane, of San Antonio, of counsel), for appellant.

Schlesinger, Goodstein & McGuire and T. P. Hull, all of San Antonio, for appellees.

McGILL, Special Commissioner.

Appellees, the widow and surviving children of John H. Fullilove, deceased, sued appellant, a private corporation, for exemplary damages, alleging that the death of Fullilove, who was an employee of appellant engaged in oiling or repairing a large concrete mixer, was caused by the gross negligence of appellant and one of its employees. Trial to a jury resulted in findings of gross negligence in several respects alleged, which proximately caused the death of Fullilove. The total amount of exemplary damages was fixed at $15,000, which was apportioned among appellees, and for which judgment was accordingly rendered.

Appellant's points I to III are based on the proposition that there was no evidence of gross negligence, and that its motions for a peremptory instruction and for judgment non obstante should have been granted.

The tragic death of the deceased Fullilove occurred on November 15, 1942, while he was employed by appellant and engaged in helping to repair a concrete mixer or paver owned by appellant and used by it on the Laredo Gunnery School project. This machine is a self-contained unit weighing approximately twenty tons, used for mixing concrete. A part of it consists of a "skip" or receptacle in which the aggregate, consisting of cement, sand and gravel, is dumped and conveyed into a circular drum where it is mixed by means of revolving metal blades. These blades are about 36 or 40 inches long, 16 or 18 inches in width, and weigh about 25 or 30 pounds each. Johnson was the operator of the machine; Barton the mechanic in charge of the repairing of all of appellant's equipment. Fullilove had been employed by appellant from the last of the month of May preceding the accident, and his duties were to oil and clean the machine, which was done when it was not in operation. Fullilove was inside the drum when he was killed by the machine being put in gear by Johnson causing the blades to revolve and pin him in a two or three inch space between the blades and the "chute" by which the mixed aggregate was conveyed from the drum.

On the evening prior to the accident Johnson had been advised by White, the concrete foreman, that he would have a few days in which to make needed repairs on the machine. He and Fullilove had removed some of the blades from the drum and taken them to the repair shop to be straightened. On the morning of the accident Barton and Johnson went to the repair shop, procured the blades and a strip of metal sheet to be used in repairing of the "skip" and brought them to the machine. Fullilove helped to unload the blades which were placed on the machine within two or three feet from the entrance to the drum. Barton testified: "And then I told Fullilove that he and Johnson were to help the welder get his sheet iron placed in the skip of the mixer that was to be welded; and while the welder was welding they were to get in the drum and put the blades in, one or both of them, if it took the two of them. It is generally a one-man job or two men can go in, as there is plenty of room in the drum for two men." After giving these instructions

Barton left and did not return until after the accident.

Johnson, after testifying that he and Barton had gone to the repair shop and gotten the metal strip with which to patch the "skip" and the blades for the drum, continued: "Mr. Fullilove was also on the machine and * * * the evening before he and I took some blades out of the drum of the paver, and I carried them to the shop to have them straightened. And the next morning I came out to work, I came out to the machine, and there wasn't anyone there at the time. I went and got Mr. Barton, the mechanic, and we talked over what we were going to do to the machine. And we decided to put a plate in the skip, which was broken in several places. And we went to the shop and got the plate on his pick-up. And if I am not mistaken, he pulled the welder over behind his car. We carried the welder over there to put the plate in. And to put the plate in and to make it bend according to the shape of the skip, there had to be pieces of it cut off and other pieces bent. We had lifted it in the skip several times and got our measurements, and then we would take it out and hammer it so as to give it the proper bend. And we placed it back in there. We needed a little more help than we had there to handle the metal with, and Mr. Barton went and got another boy to come over there to help us. I don't recall his name. We called him Heavy. I don't know his name. He came over there and he assisted us in lifting this sheet metal out. And we got it fixed so the welder could weld certain parts of it. We needed a jack so as to press it down in other places. And Heavy and myself got in my car and went down to the shop and got a big jack and a bar. At that time it was pretty close to twelve o'clock, and as we went back we stopped at the lunch room, and I don't remember that the other boy got but I got a sandwich and a bottle of milk and carried it to the machine. And we took the jack and bar out. And the welder was still welding. We could not do anything while the welder was working on the machine. So I ate the sandwich and drank the milk. And when the welder got through my intentions were to go up there and get those pieces so the welder could weld it. And just as I finished eating the sandwich a Mr. Perry came over to the machine and said he wanted the machine moved if we could move it. I saw him over there and I went over there, and he asked us could we move the machine back a short way, that he wanted to put a ditch through there. And I told him that we could move it back. And he asked us would it interfere with the work we were doing. I told him no, that we would not have to move that from the ground, that we would just back up and let that drag on the ground. And I cranked the motor up, and it was cold, it had not been cranked that morning. And it died. And I cranked it again. And I stood there for a few minutes to see whether it was going to keep running or whether I was going to have to choke it a little bit more. The motor was running slow and I got up on top of the machine and I pulled the clutch over, I did not engage the clutch but I pulled it over. Frequently there is concrete and things that are in the machine that makes a noise, and I pulled it over and I just threw it back out and walked around and looked in and I saw Mr. Fullilove in the drum. And I called the boys down there to help me get him out."

Johnson admitted that he had heard Barton tell Fullilove that he wanted him and Johnson to help the welder get the sheet iron plates in the skip of the machine so that they could be welded, but denied that he heard the instructions that Fullilove and he, one or both, should get in the drum and put the blades in while the welder was welding. His explanation of why he pushed the clutch and threw it out was that as he touched the clutch he happened to think that there might be some concrete in the drum that might get caught. When asked why he did not look first to see if there was some concrete in there before he touched the clutch, he said: "I don't know." "Q. You just never thought, did you? A. Well. I didn't have any reason for looking in there." He testified that he and "Heavy" were gone from the machine about ten or fifteen minutes when they went for the jack; that he sat in his car about ten minutes after they returned, eating his sandwich and drinking his milk; that he noticed the welder working and also saw "Heavy"; that he didn't see Fullilove when he returned—, the last time he saw him was immediately before leaving for the jack when he was working on the skip helping the welder. He conceded that it would have been possible for one man to replace the blades in the drum while the welder was finishing his work on the skip, although it would have been "a pretty tough

job" for one man; that the work could have gone on inside the drum without interfering with the work that was being done on the skip; that it was a clear, open country in the vicinity of the machine; that when he cranked the motor he had not noticed whether Mr. Fullilove was there or not; that the presence or absence of Fullilove from the machine after he returned just did not enter his mind.

The jury found that it was gross negligence for appellant to start the concrete mixer while Fullilove was inside the drum; also for Johnson to fail to look inside of the drum of the concrete mixer before starting same, and that each of said acts was a proximate cause of the death of Fullilove.

■ The following definition of gross negligence given by Chief Justice Stayton in Missouri Pacific Ry. v. Shuford, 72 Tex. 165, 10 S.W. 408, has been followed with approval in an unbroken line of decisions of the Supreme Court, the most recent of which is Bennett v. Howard, 170 S.W.2d 709: "Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it. Southern Cotton Press & Mfg. Co. v. Bradley, 52 Tex. 587, 600." [72 Tex. 165, 10 S.W. 411.]

In Texas Pacific Coal & Oil Co. v. Roberts, 125 Tex. 4, 79 S.W.2d 830, 832, 98 A.L.R. 262, it was pointed out that the mental attitude of the person charged to have been grossly negligent is important in view of the use of the words "conscious indifference" in the above definition. The text in 13 Tex.Jur. p. 241, Sec. 133, cited with approval in Bennett v. Howard, supra, states: "His purpose or intention is determinative of his liability for exemplary damages." It is also stated in Texas Pacific Coal & Oil Co. v. Roberts, supra, that "His failure to think of a possible result of his act might be evidence of negligence, but it is not evidence of gross negligence, because it does not constitute or indicate [a] 'conscious indifference.'"

■ We have concluded from a careful examination of the statement of facts that there was no evidence of gross negligence, and appellant's request for a peremptory instruction should have been granted. Appellees do not contend that Johnson had actual knowledge of Fullilove's presence in the drum when he pulled the clutch; nor do we understand their contention to be that he was conscious of the possibility of his presence there. The contention goes no further than that when Johnson disengaged the clutch, he did so because his subconscious mind told him that Fullilove was in the drum, and that under all the circumstances the jury was warranted in finding that Johnson should have been conscious of the possibility of the presence of Fullilove in the drum when he "caught the master clutch in my hand and just pulled it over a little bit—never did engage the knuckle of the clutch any; just touched it."

Under the rule enunciated in the above decisions, Johnson's failure to think of a possible result of his act is not enough to constitute gross negligence. He must have at least been actively conscious of the possible result of his act to render him guilty of "conscious indifference" to its possible result.

■ We are also of opinion that the evidence was insufficient to show that Johnson was the vice-principal or alter ego of appellant, so as to render it liable in exemplary or punitive damages for his act, which clearly was not previously authorized or subsequently ratified by it, and which did not constitute the violation of a non-delegable duty owed by it to Fullilove. The uncontroverted evidence shows that Johnson was the operator of the concrete mixer or paver by which Fullilove was killed. He had no authority to hire or discharge employees. Barton was the man in charge of repair of all of appellant's equipment, including this machine. It is true that in his absence, "Mr. Johnson was the foreman in a sense, because they all looked to the operator as to what they should do next." But in no sense had appellant confided to Johnson "the management of the whole or a department or a division" of its business. His duties were confined to the operation of that particular machine; and to its repair under the supervision and direction of Barton. Fort Worth Elevator Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397, at page 406.

Our disposition renders unnecessary a discussion of appellant's other point.

The facts have been fully developed. The judgment is reversed and judgment

here rendered that appellees take nothing and that appellant recover its costs.

Reversed and rendered.

This opinion directed to be written and is approved by the Court.

WALTHALL, J., not participating.

### On Rehearing.

PRICE, Chief Justice.

We have carefully reviewed this case on plaintiffs' able and vigorous motion for a rehearing and adhere to the views expressed in the original disposition thereof.

In additional support of the proposition that the relationship of Johnson to the defendant was not such that it could be held to answer in exemplary damages for his acts, see: Young v. Hahn, 96 Tex. 99, 70 S.W. 950; Lantry-Sharpe Contracting Co. v. McCracken, 105 Tex. 407, 150 S.W. 1156; Magnolia Petroleum Co. v. Studdard, Tex.Civ.App., 83 S.W.2d 1047; Magnolia Petroleum Co. v. Booth, Tex.Civ. App., 105 S.W.2d 356 writ of error denied.